**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARTREECE BELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:16-cv-01658-RDP** |
| | } | |
| **STATE OF ALABAMA DEPARTMENT** | } | |
| **OF HUMAN RESOURCES, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment (Doc. #49) filed by

Defendants the State of Alabama Department of Human Resources ("ALDHR") and Jefferson

County Department of Human Resources ("JCDHR") on March 8, 2018.  The Motion (Doc. #49)

is fully briefed and supported by the parties' evidentiary submissions.[1]  (Docs. #49-52, 56-57).

For the reasons set forth below, the court finds that the Motion for Summary Judgment (Doc.

#49) is due to be granted in its entirety.

---

[1] This court's Initial Order (Doc. #8), entered here on November 29, 2016, requires all summary judgment briefing to comply with Appendix II to the Order.  Plaintiff's Memorandum in Response to Defendants' Motion for Summary Judgment (Doc. #56) fails to comply with Appendix II, particularly with the recitation of the facts, whether disputed or undisputed, and the failure to cite authority in the record.  The court has carefully studied Plaintiff's Memorandum (Doc. #56) to parse out disputed and undisputed facts and to find support in the Rule 56 record.  However, this is the job of counsel, not the court.  Counsel for Plaintiff is **CAUTIONED** that any further summary judgment briefing in this court, not just in this case, **SHALL** follow the requirements of Appendix II to the Initial Order or counsel will be ordered to re-brief the pertinent filing.

## I.     Introduction

Plaintiff Martreece Bell ("Plaintiff" or "Bell") filed a Second Amended Complaint[2] (Doc. #33) in this court on July 21, 2017 alleging racial discrimination in violation of Title VII (Count I), sex discrimination in violation of Title VII (Count II), retaliation in violation of Title VII (Count III), and violation of the Fourteenth Amendment (Count IV).   All claims are asserted against both ALDHR and JCDHR (collectively "Defendants").   (*See* Doc. #33).   Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims because there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law.   (Doc. #49, ¶ 6).   The court agrees.

## II.     Relevant Undisputed Facts

The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.   All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).   These are the "facts" for summary judgment purposes only.   They may not be the actual facts that could be established through live testimony at trial.   *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).   Asserted "facts" that are not facts at all will be disregarded.   *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value).

---

[2] On December 22, 2016, in response to a Motion for a More Definite Statement filed by Defendants, Plaintiff filed a First Amended Complaint (Doc. #11).   In response to Defendants' Motion to Dismiss Amended Complaint (Doc. #14), the court dismissed with prejudice certain claims outlined in the First Amended Complaint. (Docs. #27, 28).   The operative Second Amended Complaint (Doc. #33) was filed on July 21, 2017.

## A. Plaintiff's Employment at JCDHR

Plaintiff Martreece Bell was appointed to the position of Administrative Support Assistant I (ASA I) at JCDHR effective May 3, 2004. (Doc. #51-1, Bell Personnel File at 1083). Plaintiff regularly scored "Meets Standards" or "Exceeds Standards" on her annual performance appraisals and was promoted to Administrative Support Assistant II (ASA II) on or about May 16, 2007. (*Id.* at 1058). From May 2007 until August 2015, Plaintiff received "Exceeds Standards" scores on all annual appraisals. (*Id.* at 1031, 1033, 1036, 1039, 1043, 1046, 1049, 1052, 1055).

Plaintiff regularly worked on the eighth floor of the JCDHR in the child support unit. (Doc. #51-2, Bell Dep. at 50). Tracie Hawkins was her immediate Supervisor. (Doc. #51-3, Heath Dep. at 42; Doc. #51-1, Bell Personnel File at 1031). Yolanda Boleware, who served as the Program Manager over the Child Support Program, was her Reviewing Supervisor. (Doc. #51-5, Witness Statements at 1019; Doc. #51-1, Bell Personnel File at 1031; Doc. #51-7, McClintock Dep. at 15).

## B. The August 21, 2015 Incident

On Friday, August 21, 2015, Plaintiff was working the front window of child support on the seventh floor of JCDHR.[3] (Doc. #51-2, Bell Dep. at 50-52). While she was working behind the glass in the lobby reception area, Plaintiff was approached by a client, referred to herein as "DS." (*Id.* at 55). Communicating through the plexiglass that separates employees from clients, DS asked for an application. (*Id.* at 55, 58). Plaintiff spoke through her microphone and asked DS for picture identification, which is required to receive any services from child support. (*Id.* at 55). DS responded that she did not have picture identification and according to Plaintiff "started

---

[3] Plaintiff was not regularly assigned to work the child support window on the seventh floor and was filling in this day for the employee who typically worked in that position. (Doc. #51-2, Bell Dep. at 51). Plaintiff had worked the window before in a fill-in capacity. (*Id.* at 51-53).

talking loud" and being "rude and obnoxious" because "she did not understand why she needed a picture ID just to receive an application." (*Id.* at 55, 67; Doc. #51-5, Witness Statements at 1018). Plaintiff "tried to explain [the] policies [of the] department but [DS] would not listen." (Doc. #51-2, Bell Dep. at 56). Plaintiff then turned off her microphone because DS was yelling and notified Program Manager Yolanda Boleware of the situation. (*Id.* at 56; Doc. #51-5, Witness Statements at 1018).

At approximately 3:00 p.m., Program Supervisor Cassandra Jones was approached in the lobby by DS. (Doc. #51-5, Witness Statements at 1019). DS told Jones that she was having a problem with "the lady at the front desk." (*Id.*). Jones went to the front desk to ask Plaintiff about the situation. (*Id.*). Jones reports that she "was told the same thing by Martreece [sic] Bell who was working at the front desk for Child Support. Ms. Bell was very rude with her tone, and her body language. Her exact words to me were 'Like I said she has to have an ID to obtain an application, or to see a manager.' I asked the client to have a seat while I tried to contact Child Support Program Manager Yolanda Boleware. Apparently, [Plaintiff] contacted Ms. Boleware because she came down to the front desk before I could call her." (*Id.* at 1019, 1020).

When Boleware arrived, "the client was still out in the lobby yelling and talking." (Doc. #51-2, Bell Dep. at 57). Boleware turned the microphone back on and Plaintiff explained the situation to Boleware. (*Id.* at 56-57, 65). Boleware spoke with the client. (*Id.* at 66). However, after speaking with Boleware the client did not leave the lobby. (Doc. #51-5, Witness Statements at 1018, 1020).

Plaintiff signed out of work at 3:00 p.m. yet continued to work until 4:30 p.m. because no one arrived to relieve her at the child support window. (Doc. #51-2, Bell Dep. at 71, 73). At approximately 4:33 p.m., Plaintiff left work for the day and entered the elevator lobby of the

seventh floor. (*Id.* at 76-77; Doc. #51-4, Video). A few seconds later, DS entered the same elevator lobby with one child on her hip and another small child at her side. (Doc. #51-2, Bell Dep. at 81, 95-96; Doc. #51-4, Video). The events that ensued from that point were captured by a security camera. (Doc. #51-4, Video). The video has no sound. (*Id.*; Doc. #51-3, Heath Dep. at 28). Plaintiff testified that when she entered the elevator lobby, DS mumbled something and then clearly said, "B**ch, you off the clock now." (Doc. #51-2, Bell Dep. at 80). After some back and forth, the argument escalated. As Plaintiff testified:

[S]he told me I had a smart mouth. I told her she had a smart mouth, and then she said, I got you. I got something for you. She threw her hand up. I threw my hand up in protection, because her hand up.

Yes, I saw that she had her child on her hip, but her hand went up first. Once her arm went up, mines did, too. So when she kept telling me that she had something, I've got something for you, I've got something down in the car for you. I got you. I got you. And then she kept saying it. She said, I'm going down to the car to get something for you. I got you. I got you.

Katiua was getting in between us. The elevator door did open. I turned to go towards the elevator, but it's 4:30. The elevators, you have to wait on the elevators several times when you're standing out in the hall at 4:30, because they're crowded. So when Katiua got in between us, I looked in the elevators, but I couldn't get in the elevators. She still was coming towards me. She's still talking to me telling me that what she's going downstairs to her car to get.

My kids are downstairs waiting on me. In my mind, my kids are downstairs. I'm thinking about my kids. What if she get downstairs and my kids down there? What possibly could she do to my kids?

They pull us apart. I started going back towards the door when they kind of get us apart. As I'm walking back to the door, then she tells me that she's going down to the car. She's going to get a weapon for me. I come back out of the door, because now I'm trying to get to the stairwell to get downstairs to my kids. Now, in my mind, my kids are downstairs. Am I concerned about anybody else? I'm concerned about my children. My kids are all that I have. So I'm trying to get down to see about my kids.

So I – in my mind, I wasn't trying to cause her harm or trying to cause her kids harm. I'm trying to get to my own kids. That's what I'm trying to do. But she just kept going on and on telling me that she's going down to her car to get something. I got you. I got you, Ms. Smartie. I got you. And she's using

profanity. So what am I to do? Not protect myself or not protect my kids? And it was over.

(*Id.* at 81-83).

About a minute after Plaintiff and DS are seen in the elevator lobby together, security guards entered the space. (Doc. #51-2, Bell Dep. at 101-02). One security officer escorted DS downstairs while the other security officer remained with Plaintiff until the Birmingham Police Department arrived. (Doc. #51-5, Witness Statements at 1018). The Birmingham police officer listened to Plaintiff's account and escorted Plaintiff to her car for safety. (*Id.*). No police report was completed at that time. (Doc. #51-3, Heath Dep. at 21). Security Guard Supervisor Quincharlotte Moulton called Dough Heath, the Assistant Director of the Child Support Unit and Building Services, immediately following the incident. (*Id.* at 9). Heath was informed that "a client attacked a worker" but that the worker was alright. (*Id.*).

## C. The Investigation of the Incident

On Monday, August 24, 2015 Heath spoke with Boleware about the incident. (*Id.* at 7, 10-11). Boleware informed Heath that Plaintiff was not at work that Monday because "she was complaining of a shoulder injury or something in regards to the incident." (*Id.* at 11). Heath explained to Boleware that an internal incident report needed to be completed. (*Id.*). On the same day, Heath called Angela McClintock, the Director of JCDHR, to inform her of the incident. (*Id.* at 11-12).

Heath commenced an investigation of the elevator lobby incident because he feared that Defendants might face a lawsuit from DS. (*Id.* at 13-14, 23; Doc. #51-7, McClintock Dep. at 136). He requested a copy of the surveillance video from the lobby. (Doc. #51-3, Heath Dep. at

13-14).  He requested written statements from Jacqueline Wright,[4] Quincharlotte Moulton, Sophia Jackson, Cassandra Jones, and Plaintiff Martreece Bell.  (*Id.* at 23-25).  He also directed Plaintiff, through Boleware, to make a formal report with the Birmingham Police Department. (*Id.* at 109).

On August 25, 2015 (the first day Plaintiff returned to work following the incident), at 8:40 a.m., Plaintiff filed a report with the Birmingham Police Department.  (Doc. #51-6, Police Report).  According to the report, Plaintiff stated to the officer that:

> a client … approached [Bell] from behind on the 7th floor hallway near the elevators.  The victim stated that the suspect 'got up against her back' and said "bitch, you off the clock now!"  The victim and suspect 'had words' until a co-worker (witness – Katiua Walker) and a security guard separated them. … The victim stated that her shoulder and neck were injured during the incident when she was 'pulled away' from the suspect by the co-worker and security in an effort to diffuse [sic] the situation.

(*Id.*).

On the same day Plaintiff wrote a statement for JCDHR.  In that report, Plaintiff states:

> [DS] approached me from behind as I was texting with my daughter and began to mumble some words at me in which I could not understand.  I then turned and responded to her at which Ms. Walker got between us to ensure that there was no physical contact between us.

(Doc. #51-5, Witness Statements at 1018).

Quincharlotte Moulton, one of the security officers who witnessed both the window incident and the elevator lobby incident, wrote:

> The client became very loud at the window and came to the security desk and asked me … to call a supervisor for her.  I … explained to the client that each window has its own supervisor and she needed to ask for the supervisor at the window.  By that time a Food Stamp Supervisor went to the window with the unknown client.  I seen a paperwork was given the unknown client began to complete the paperwork. … I … seen how the client was waiting for the worker to

---

[4] Although Heath believes that he requested statements from Jacqueline Wright and Sophia Jackson, no statements from these individuals are found in the Rule 56 record.  (*See generally* Doc. #51-5, Witness Statements at 1013-1020).

leave the window.  I … told Officer Howard to make his way into the (outer lobby by the elevators and to get in the elevator just in case something was to happen) by [the] time Officer Howard made his way in to the outer lobby the two was into a verbal altercation.  I … made my way into the outer lobby I seen as the unknown client was trying to attack [sic] the state work[er].… The first thing I … done was gotten the state worker and directed her into the inner lobby so I could have eyes on her as I called the police as Officer Howard directed the unknown client along with her 2 kids out the building.

(*Id.* at 1015-16).

Co-worker Katiua Walker also provided a written statement dated August 25, 2015.

Walker wrote:

> When we go to the elevators client came behind us.  I could feel the client behind me.  Something was said and that is when everything between [Plaintiff] and the client started.  What was being said between the client and [Plaintiff] I do not know.  When I notice the client walking up toward [Plaintiff] I jumped in the middle to stop it.  By this time it was out of control, [another co-worker] and I was trying to stop them from getting close to each other. … by this time security finally came out to help but we had kind of gotten things under control by then.  The client was still talking and I told her that she needed to get on the elevator and leave; I said this several times and asked the guard to escort her (client) on the elevator.

(*Id.* at 1020).  Heath watched the security video on his desktop computer.  (Doc. #51-3, Heath Dep. at 27-28).  After watching the video, he concluded that Plaintiff was endangering DS's children by her reaction to the incident and not behaving in an appropriate manner for a state worker.  (*Id.* at 33, 162-63).  He believed that Plaintiff "had ample opportunity to exit the situation and chose not to and actually continued to instigate."  (*Id.* at 35).  He did not credit Plaintiff's accounts of the event after viewing the video.  (*Id.* at 176-77).

After reviewing the witness statements and the video, Heath updated Director Angela McClintock on the incident.  (*Id.* at 29, 42).  Heath was concerned about inconsistencies he perceived between the statements and the video itself.[5]  (*Id.* at 116) ("[t]he statements are not

---

[5] Boleware also noted inconsistencies between Plaintiff's statements and the video itself.  Specifically, Boleware noted that Plaintiff was never approached from behind.  (Doc. #51-18, Boleware Dep. at 117).  Boleware

8

completely indicative of what transpired on the video"). Specifically, Heath noted that Plaintiff stated in the police report that DS "got up against her back," but the video shows Plaintiff with her back up to the elevator wall and DS coming in from Plaintiff's side and front. (*Id.* at 117-21). During a verbal exchange, the elevator door opens. (*Id.* at 118-20). No one is blocking Plaintiff's access to elevator, yet she does not get in. (*Id.* at 119-20). About fourteen seconds later, the incident starts to escalate with Plaintiff and DS seen pointing at each other. (*Id.* at 120).

After reviewing the video and statements, McClintock,[6] Kimberly Camp (JCDHR Personnel Manager), Kelly Lever (ALDHR Personnel Manager), and Heath decided to begin the process to have a charge letter issued to Plaintiff.[7] (*Id.* at 43-45, 150). Charge letters are sent to the ALDHR personnel department for review. (*Id.* at 41-42, 151). ALDHR "review[s] it, suggest[s] changes to the format, or ask[s] questions for clarification. They staff the case with the legal department." (*Id.* at 151). Upon completion of that process, the charge letter was issued to Plaintiff. (*Id.* at 29-30).

### D. The Charge Letter and Resulting Termination of Plaintiff's Employment

Under Alabama law, "Merit System Employees" have a statutory interest in their employment and are entitled to due process as it relates to terminations and suspensions. (Doc. #51-9, Ala. Code 1975 § 36-26-27). State employees have the right to request a hearing before

---

also noted that Plaintiff does not appear to be texting in the video, although she wrote in her statement to JCDHR that she had been texting her daughter. (*Id.* at 117). Boleware testified that she was "shocked at the video, because I could not believe the actions [Plaintiff] took." (*Id.* at 119).

[6] McClintock watched the video and "saw angry gestures. I saw Ms. Bell having to be pulled back from the client, and even, if I remember correctly, someone was guiding her back inside, and she turned around and went back towards the client. And all of that culminates into unacceptable treatment of clientele as well as violence in the workplace." (Doc. #51-7, McClintock Dep. at 18). "I saw in the video Ms. Bell several times with her arms like this (indicating) going towards the client, who was holding an infant as well as having another child. She was being physically restrained. Therefore, had she not been physically restrained, she would have gone further." (*Id.* at 20).

[7] Boleware was not aware that the decision had been made to issue a charge letter to Plaintiff. (Doc. #51-18, Boleware Dep. at 44-45). She was not asked for her opinion on the incident after viewing the video. (*Id.* at 46-48). Boleware was not asked to review the charge letter before it was presented to Plaintiff. (*Id.* at 33).

the State Personnel Board on the issue of whether they were properly terminated, and the State Personnel Board has the authority to direct a state agency, like JCDHR, to reverse its employment decision and reinstate the employee with lost benefits and wages. (*Id.*). Some state agencies, like JCDHR, provide an additional layer of due process protection by affording their employees a pre-termination hearing. (Doc. #51-10, Employee Handbook at 452-55). As part of that process, a DHR employee is entitled to a formal "charge letter" setting forth the factual allegations against them and alleged rules violations. (*Id.* at 452-53). The employee is then provided a hearing in front of a hearing officer who considers the evidence, determines whether the charge letter is supported, and makes appropriate recommendations as to the appropriate level of discipline, if any. (*Id.* at 455).

Pursuant to this process, Plaintiff was provided with a charge letter on September 30, 2015. (Doc. #51-1, Bell Personnel File at 1027-28). The charge letter sets out as its basis the child support window incident as well as the elevator lobby incident. (*Id.*). With regard to the window incident:

> [DS] reported to Ms. [Cassandra] Jones that you were being very unprofessional. Ms. Jones spoke with you about the client's complaint. You stated to Ms. Jones in a very rude tone 'like I said she has to have an ID to obtain an application or see a manager.' … DS reported to Ms. [Yolanda] Boleware that you had been very rude and she wanted to file a complaint. … Your behavior in response to Ms. Jones was rude and unprofessional.

(*Id.*).

And, with regard to the elevator lobby incident, the charge letter stated:

> You and the client had to be separated by co-workers and security guards. … Although you had been separated from the client, you continued to go around both the security guard and your co-workers in an attempt to physically attack the client. You can be seen lunging toward the client while she was holding her baby and her small child standing next to her. It took several attempts by the security guard and your co-workers to get you into the lobby and away from the client who was standing at the elevator with another security guard.

(*Id.*).

The charge further alleges that these incidents violate department rules on "disruptive conduct of any sort," "treatment of clientele," and "conduct unbecoming a state employee." (*Id.*). The letter sets an Administrative Hearing for review of the charge for October 29, 2015 at 10:00 a.m. (*Id.* at 1027). The last page of the letter states that: "If evidence supports these charges, it could result in disciplinary action of increasing severity, including suspension up to 30 days in a calendar year, demotion, or termination of employment." (*Id.* at 1028).

Boleware and Camp were with Plaintiff when she was presented with the charge letter. (Doc. #51-3, Heath Dep. at 123). Plaintiff signed an acknowledgement that she received the charge on September 30, 2015 and said she would resign effective immediately. (Doc. #51-1, Bell Personnel File at 1029; Doc. #51-3, Heath Dep. at 123; Doc. #51-18, Boleware Dep. at 153-54; Doc. #51-2, Bell Dep. at 138). Boleware told Plaintiff that she should go home and take some time and think about it before resigning. (Doc. #51-3, Heath Dep. at 123-24; Doc. #51-18, Boleware Dep. at 153-54). Camp reaffirmed for Plaintiff that she did not have to make a decision about resignation that day.[8] (Doc. #51-3, Heath Dep. at 123-24).

With service of the charge letter, Plaintiff was also informed that she was being placed on mandatory annual leave/leave without pay pursuant to Rules of the State Personnel Board, Chapter 670-X-15.06.[9] (Doc. #51-12, Mandatory Leave Letter). Heath asked Plaintiff for her

---

[8] In her Memorandum in Response to Defendants' Motion for Summary Judgment, Plaintiff's counsel makes the assertion that "Bell was advised by Dough Heath that she would be better off resigning than waiting for the administrative hearing and getting fired." (Doc. #56 at 10, ¶ 14). However, that bald assertion is not accompanied by any citation to the record. (*Id.*). The court has carefully reviewed the record, including Plaintiff's deposition testimony, and can find no Rule 56 evidence to support this assertion. Therefore, it is not considered in the court's analysis.

[9] Mandatory leave cannot be approved through JCDHR. (Doc. #51-3, Heath Dep. at 152). JCDHR requests mandatory leave, but the state personnel department, an entirely different entity, must approve the request. (*Id.* at 152-53).

badge and key and asked Boleware to escort Plaintiff out of the building. (Doc. #51-3, Heath Dep. at 124).

On October 15, 2015, Plaintiff sent an email to Angela McClintock with copies to Boleware, Hawkins, and Heath. (Doc. #51-1, Bell Personnel File at 1026). The email states:

> My apologies for notifying you by email. However, circumstance permits me [sic] from coming into the offices. Please accept the email message as a notification I would like to resign from my position as a ASA II with the Department of Human Resources effective October 16, 2015.
>
> I am so appreciative of the skills that I learned while working for the agency and grateful to have worked in the Child Support department. Thank you again.
>
> Warmest regards,
>
> Mrs. Martreece M. Bell

(Doc. #51-2, Bell Dep. at 147-48; Doc. #51-1, Bell Personnel File at 1026).

Plaintiff understood when she sent this letter that there would be no hearing on October 29. (Doc. #51-2, Bell Dep. at 148). Plaintiff testified that she resigned because she was caring for sick family members, was not sleeping, and she needed to move on and do what she needed to do to provide for her family. (*Id.* at 149-50). She further testified that she did not think that she was going to get a fair hearing because "most of the black females that I've known that have had a hearing with DHR, it never came out right. They were always fired." (*Id.* at 151). "I didn't think they were going to listen." (*Id.* at 152).

## III. Analysis

After careful review of the Rule 56 record, the court finds that Defendants' Motion for Summary Judgment (Doc. #49) is due to be granted. Below, the court discusses the facts presented by the Rule 56 record and evaluates each of Plaintiff's claims.

## A.      Race and Sex Discrimination under Title VII (Counts I, II)

Defendants argue that they are entitled to summary judgment on Counts I and II of Plaintiff's complaint because Plaintiff voluntarily resigned her position at JCDHR, she was not treated differently than similarly-situated employees, and she cannot establish that Defendants' articulated legitimate, non-discriminatory reason for termination was a pretext for discrimination. (Doc. #50 at 18-24).   The court agrees that Defendants are entitled to summary judgment on Plaintiff's claims for race and sex discrimination, but not for all of the reasons they have asserted.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   The plaintiff bears the burden of establishing the *prima facie* case of race and sex discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

To establish the *prima facie* case of disparate treatment discrimination using the *McDonnell Douglas* burden-shifting framework,[10] Plaintiff must present evidence that (1) she belongs to a protected class of individuals; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly-situated, non-

---

[10] Although Plaintiff makes a cursory argument that this is a direct evidence case (Doc. #56 at 19-20), there is nothing in the record to support that argument.   "Direct evidence is that, if believed, proves the existence of discriminatory intent without inference or presumption."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004).  It consists of "only the most blatant remarks" that prove intent to discriminate with no further inference. *Earley v. Champion Int'l*, 907 F.2d 1077, 1081 (11th Cir. 1990).   Plaintiff suggests that a comment made by Defendants in response to discovery is direct evidence of discrimination – that comment being that Plaintiff "has a propensity for and is prone to violence."   (Doc. #56 at 20).   This comment could only evidence race and/or gender discrimination with a giant inferential leap.  *Hamilton v. Sheridan Healthcorp, Inc.*, 700 Fed. Appx. 883, 886 (11th Cir. 2017) (holding that a comment that a doctor could not be "the face of the department at night" required too great an inferential leap to constitute direct evidence of discriminatory intent); *Torres-Skair v. Medco Health Solutions, Inc.*, 595 Fed. Appx. 847, 852 (11th Cir. 2014) (holding that comments that a pregnant employee was "moody" and "hormonal" were not direct evidence of discrimination because a factfinder must still infer the discriminatory animus). Therefore, a circumstantial evidence analysis governs this case.

African American women employees more favorably.[11]  *Burke-Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006); *see also McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (stating that a plaintiff must produce evidence of similarly-situated comparators when he alleges that other employees engaged in similar conduct but were not similarly disciplined).  That is, Plaintiff must set forth "facts adequate to permit an inference of discrimination."  *Holifield*, 115 F.3d at 1562.

Once a plaintiff has established the *prima facie* case, the burden shifts to the employer to articulate "legitimate, nondiscriminatory reasons for the challenged employment action."  *Combs v. Plantation* Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).  Producing evidence (whether ultimately persuasive or not) of legitimate nondiscriminatory reasons for its actions is enough for the employer to satisfy its burden."  *Id.*

If a defendant carries its burden of production, the initial presumption of discrimination established by the plaintiff's *prima facie* case evaporates.  *Wilson*, 376 F.3d at 1087.  "[A]nd the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination."  *Id.*  "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it."  *Id.* at 1088.

### 1.  The Adverse Employment Action

Defendants argue that Plaintiff cannot establish a prima facie case of either race or gender discrimination for a simple reason - she was not subjected to an adverse employment action.

---

[11] An alternate method of establishing the last prong of the *prima facie* case of disparate termination is for a plaintiff to establish that she was replaced by someone outside of the protected class.  *Cuddeback v. Fla. Bd. of Educ.,* 381 F.3d 1230, 1236 (11th Cir. 2004); *see also Hooper v. Total Sys. Servs., Inc.*, 799 F.Supp.2d 1350, 1364 (M.D. Ga. 2011).  However, here, Plaintiff does not dispute that she was not replaced by a new hire.  Rather, her job responsibilities were divided among current employees, all of whom were African American females.  (Doc. #50 at 9-10, ¶ 17; Doc. #56 at 10, ¶ 17).

(Doc. #50 at 18-21). An adverse employment action is a necessary element of a discrimination claim. But "[a]n employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001). The question of whether an employment action is adverse is objective: the plaintiff "must demonstrate that a reasonable person in [her] position would view the employment action in question as adverse." *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir. 1998).

Here, Plaintiff resigned her employment. (Doc. #51-1, Bell Personnel File at 1026; Doc. #51-2, Bell Dep. at 148-52). Based on this fact, Defendants argue that Plaintiff cannot establish the *prima facie* case because there was no adverse employment action. (Doc. #50 at 18-21). While it is true that, based on the facts presented here, the court would likely find that Plaintiff's resignation of employment was voluntary,[12] that is not the relevant inquiry here. In actuality, the purported adverse employment action occurred *prior to* the resignation when, on September 30, 2015, Plaintiff was issued a charge letter and suspended from employment without pay. (Doc. #51-12, Mandatory Leave Letter at 1093). Although the charge letter itself did not constitute an "ultimate employment decision," it did, in a "substantial way, alter [Plaintiff's] compensation, terms, conditions, [and] privileges of employment." *Phillips v. Gestamp Al., Inc.*, 2018 WL

---

[12] Resignation of employment is presumed voluntary "unless an employer forces the resignation by coercion, duress, or misrepresentation of a material fact." *Williams v. Ala. Dep't of Corr.*, 649 Fed. Appx. 925, 928 (11th Cir. 2016) (*citing Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) for the principle that resignations are presumed to be voluntary). In determining whether a resignation was obtained by coercion or duress, the court may consider:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

*Hargray*, 57 F.3d at 1568. "[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges." *Id.* The one exception to this rule is where the employer lacks good cause to believe that the grounds for the possible termination actually exist. *Id.*

3475432 at *7 (N.D. Ala. July 19, 2018) (Ott, J.) (quoting *Doe*, 145 F.3d at 1452). Because Plaintiff was suspended without pay and required to surrender her employee badge and key (Doc. #51-2, Bell Dep. at 141-42), she has established an adverse employment action for purposes of the *prima facie* case.

### 2. Similarly Situated Employees

Although Plaintiff has established an adverse employment action, she must also establish, for purposes of establishing a *prima facie* case, that Defendants intentionally treated her less favorably than those outside of her protected class. *Burke-Fowler*, 447 F.3d at 1323. Plaintiff contends that "white employees in that same office … routinely disrespected black clients at the service window for child support" yet were not subjected to suspension without pay as a result. (Doc. #56 at 9, 22-23).

To be an adequate comparator, the preferentially treated individual from outside Plaintiff's protected class must be similarly situated to her in all relevant respects. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n. 17 (11th Cir. 2011); *Holifield*, 115 F.3d at 1562. The Eleventh Circuit has recognized the "apparent tension in our precedent regarding the standard for evaluating a valid comparator. In some cases, we have said that the plaintiff's misconduct and the comparator's conduct must be 'nearly identical.' In other cases, we have said that a comparator is similarly situated to the plaintiff if she and the comparator were accused of 'the same or similar conduct.'" *Smelter v. S. Home Care Servs., Inc.*, -- F.3d --, 2018 WL 4560684 at *11 (11th Cir. Sept. 24, 2018) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984) and *Holifield*, 115 F.3d at 1562). However here, as in *Smelter*, to the extent those standards conflict, Plaintiff's comparator evidence fails regardless of whether

the standard applied is the lesser "same or similar" or the more exacting "nearly identical." *Smelter*, 2018 WL 4560684 at *11.

Plaintiff has identified five Caucasian individuals as potential comparators: Bonnie O'Dell Campos, Meghan Wheed, Dorothy Stancil, Janie Akins, and John Latham. (Doc. #56 at 9, 13, 22-23). Because there are significant differences in each of those employees' circumstances, however, none are similarly situated to Plaintiff and the *prima facie* case fails. [13]

With regard to Campos, Wheed, Stancil, and Latham, Plaintiff testified that she complained to Boleware "because they treated African American clients differently than whites by being rude and obnoxious to them."[14] (Doc. #56 at 13-14, ¶ 23; Doc. #51-2, Bell Dep. at 167-68, 170-71, 175-76, 185, 218). This cursory mention of the behavior of her co-workers is completely devoid of any meaningful context. (Doc. #51-2, Bell Dep. at 164-75) (*e.g.,* "[e]very time he would come, she would be rude to him;" "being rude and obnoxious at the front desk, not wanting to come to see – come down to see them;" "the language that she was using towards him … the way she was talking to him;" "talking rudely to a black male customer"). There is nothing in the Rule 56 record to explain in what way these individuals may have been "rude and obnoxious" to clients. There are no counseling records or personnel files of the purported comparators.[15] In other words, there is not even a cursory amount of evidence. In fact, there is only Plaintiff's own subjective belief that Caucasian co-workers were "rude and obnoxious" to

---

[13] Immediately apparent is the fact that Campos, Wheed, Stancil, and Akins are all females. Because they are in the same protected category as Plaintiff, female, her claim for gender discrimination using them as comparators necessarily fails. *See Herron-Williams v. Al. State Univ.*, 2018 WL 736037 at *10 (M.D. Ala. Feb. 6, 2018) ("By definition, she is not a comparator for Plaintiff because any difference in Defendant's treatment of [the comparator] and Plaintiff would have to be attributable to something other than … gender").

[14] Boleware testified that she never received any complaints from Plaintiff about discriminatory treatment at JCDHR. (Doc. #51-18, Boleware Dep. at 135, 137-38). However, for purposes of summary judgment, the court credits Plaintiff's version that she did complain to Boleware about discriminatory practices in the department.

[15] Boleware testified that she orally counseled Campos regarding her treatments of DHR clients. (Doc. #51-18, Boleware Dep. at 28). There is nothing else in the Rule 56 record to inform the court on the specifics of this counseling.

African American clients. The problem with that, of course, is that Plaintiff's subjective belief that co-workers treated clients with disrespect cannot bear the burden of establishing this prong of the *prima facie* case. *See Arafat v. Sch. Bd. of Broward Cty.*, 549 Fed. Appx. 872, 874 (11th Cir. 2013) (holding that complaint that "generically referenced younger males" as receiving more favorable treatment did "not plausibly suggest intentional discrimination"); *Curtis v. Broward Cnty.*, 292 Fed. Appx. 882, 884 (11th Cir. 2008) (finding that Plaintiff "failed to adduce any specific evidence to back up her allegations that [the purported comparators] had also hung up on customers"); *Cooper v. Southern Co.*, 390 F.3d 695, 745 (11th Cir. 2004) (holding that summary judgment was appropriate when the plaintiff relied on conclusory allegations based on her subjective belief).

As to Akins, Plaintiff argues that she is a proper comparator because she "had a lengthy record of egregious behavior including but not limited to insubordination, failing to do her job, absenteeism, tardiness, and disruptive conduct." (Doc. #56 at 23). At least in this instance, Plaintiff has advanced some evidence of Akins's misconduct. (Doc. #56, Exhs. 2, 3). But that evidence fails to establish that the two were "the same or similar" or "nearly identical."

Akins's charge letter notes violations of certain work rules - absenteeism, tardiness, failure to perform job properly, disruptive conduct, violation of specific department rules, and insubordination. (Doc. #56, Exh. 3 at 1342). Specifically, the charge letter accuses Akins of "inappropriately questioning the actions" of a supervisor, "violat[ing] the directive to follow the chain of command," sending "inappropriate [emails] in … tone, demeanor, and words," demonstrating "a complete lack of respect and professionalism," "blatant[ly] disregard[ing] directives and sen[ding] numerous emails to the state office help desk," sending a "stream of emails" to the State Office which were "disruptive and confusing," and showing no improvement

of behavior. (*Id.* at 1342-46). Akins was not suspended without pay when she was issued the charge letter bur rather was given progressive discipline including suspensions and warnings before her charge letter was issued. (Doc. #56 at 23). Unlike Plaintiff, Akins appeared for her Administrative Hearing to be heard on the charges brought against her. (Doc. #56, Exh. 3 at 1341). At that hearing, Akins admitted that she had scanned confidential food stamp records to herself. (*Id.*). As a result, Akins's access to DHR records was revoked and she was suspended without pay pending a second Administrative Hearing. (*Id.*; Doc. #56, Exh. 2).

Whether operating under a "same or similar" or "nearly identical" analysis, Akins is not a proper comparator for Plaintiff. Plaintiff was charged with violation of specific department rules and disruptive conduct, both of which Akins was also charged with. (Doc. #56-1 at 1027; Doc. #56, Exh. 3). But Akins was not charged with (or ever accused of) unprofessional treatment of clientele, violence in the workplace, violation of safety rules, and conduct unbecoming a state employee. (Doc. #51-1 at 1027; Doc. #56, Exh. 3). Comparators must be similarly situated "in all relevant respects." *Holifield*, 115 F.3d at 1562. Violence in the workplace and violation of safety rules are not comparable infractions to absenteeism, tardiness, failure to perform job properly, or even insubordination. *Smelter*, 2018 WL 4560684 at *11 (finding that "even if [Plaintiff's] performance problems were similar to [her comparators], the fact that [Plaintiff] engaged in additional misconduct – her altercation with [a co-worker] – means that she was not similarly situated to those employees and cannot rely on them as comparators").

Because Plaintiff does not advance a proper comparator for her claims of race and gender discrimination,[16] the *prima facie* case fails.

---

[16] At least until 2017, Plaintiff was the only known person at JCDHR to have been charged with violating the violence in the workplace prevention policy. (Doc. #50 at 22).

### 3. Pretext

Even assuming, *arguendo*, that Plaintiff had advanced the *prima facie* case of race and gender discrimination under Title VII (and, to be clear, she has not), her discrimination claims would nevertheless fail.[17]  Defendants have articulated a legitimate, non-discriminatory reason for acting adversely against Plaintiff – namely, "Plaintiff's repeatedly attempted attack in the elevator lobby of the Jefferson County Department of Human Resources on August 21, 2015 as recorded on the Exhibit 4 video."  (Doc. #50 at 24).  Because the articulated reason is "one that might motivate a reasonable employer," Plaintiff cannot merely "quarrel with the wisdom of that reason," but must "meet the reason head on and rebut it" to establish pretext.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Plaintiff argues that she can show pretext and presents a virtual shotgun blast of reasons for her assertion.  She contends that: (1) only "conclusory allegations" support the contention that she violated any work rules because DHR managers have not described "the exact definition of violence in the workplace and what act by Plaintiff was violence in the workplace" and have not addressed Plaintiff's "attempt to protect her children after being assaulted and threatened as workplace violence" (Doc. #56 at 7-8, ¶ 11); (2) she was "not the aggressor on the day in question and had every right under the law to defend herself from the attack" (Doc. #56 at 23); (3) she "cannot be guilty" of workplace violence because "she was off duty and in a common area of the building not the leased premises of DHR or the state of Alabama" (Doc. #56 at 7, ¶ 10); (4) employees outside of her protected class were not similarly disciplined for "far more

---

[17] Plaintiff has not argued that she can state a claim for race and/or gender discrimination under the mosaic theory.  Nevertheless, the court notes that the facts of this case do not present a triable issue of discriminatory intent when considering a mosaic of circumstantial evidence.  *Smith*, 644 F.3d at 1328.  Other than Plaintiff's broad assertion that black females tended to be fired after receiving a charge letter, there is no evidence to suggest that Defendants "consciously injected race [or gender] considerations into its discipline decision making without an adequate explanation for doing so."  *Id.* at 1341.

egregious" actions (Doc. #56 at 24); (5) "historically" when black females are charged with workplace violations, they are discharged after the Administrative Hearing (Doc. #56 at 5, ¶ 6); (6) there are corroborating statements that verify Plaintiff's version of the elevator incident (Doc. #56 at 5-6, ¶ 7); (7) Defendants are relying on their "own biased interpretation or perspective of the silent video in spite of the testimony of [Plaintiff] herself" (Doc. #56 at 6-7, ¶ 7); (8) Plaintiff's personnel file was not reviewed prior to issuing the charge letter (Doc. #56 at 8-9, ¶ 13); and (9) a "secret" investigation was conducted into the August 21, 2015 incident and Defendants "skipped over" their own progressive discipline policies (Doc. #56 at 4, ¶ 5).

The central problem with Plaintiff's scatter shot pretext arguments is that she quarrels with how Defendants interpreted the video of the elevator lobby incident. In Plaintiff's mind, she felt threatened by DS, was worried for the safety of her children downstairs, and felt justified to act the way she did to protect herself. But this is not the way Defendants interpreted the events of August 21, 2015. Defendants believed that the video evidenced Plaintiff's propensity towards violence, showed deficiencies in her judgment, and demonstrated conduct unbecoming a state employee. Unfortunately for Plaintiff, the pretext inquiry "centers on the employer's beliefs, not the employee's beliefs … and not on reality as is exists outside of the decision maker's head." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). There is nothing in the Rule 56 record to call into question Defendants' honest belief -- right or wrong -- that the incident occurred as they interpreted it after their review of the video and witness statements. *See Montoya v. Morgan*, 2018 WL 4701795 at *11 (N.D. Fla. Sept. 30, 2018) (Casey, J.). Perhaps Defendants would have come to a different interpretation had Plaintiff presented her side of the story at the Administrative Hearing. But Plaintiff resigned her employment before allowing that process to play out. *See also Damon v. Fleming Supermarkets*

*of Fla., Inc.*, 196 F.3d 1354, 1363 n. 3 (11th Cir. 1999) (noting that an employer acting "under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct").

Nor is there any evidence or inconsistency demonstrating that Defendants did not actually base their decision to issue the charge letter on the documented incident. *Montoya*, 2018 WL 4701795 at *11. As analyzed above, Plaintiff can point to no valid comparators. There is no one in the department who was treated more favorably than her in a comparable circumstance. Nor has Plaintiff cited to anything which shows that "historically" African American females were disciplined more harshly than those not in the protected category.

Importantly, whether as a technical matter it was wise to issue Plaintiff a charge letter and suspend her without pay before the Administrative Hearing is not for this court to decide. This court does not sit as a super-personnel board, *see Chapman*, 229 F.3d at 1030, and declines the invitation to become a Human Resources Director. *See Williams v. CSX Transp., Inc.*, 2015 WL 1395922 at *17 (N.D. Ala. March 25, 2015). Plaintiff's claims are for race and gender discrimination. There is no Rule 56 evidence to support those claims.

## B.      Retaliation under Title VII (Count III)

Defendants argue that Plaintiff cannot establish the *prima facie* case of retaliation. (Doc. #50 at 24-27). After careful review of the Rule 56 record, the court agrees.[18]

Title VII's anti-retaliation provision provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment … because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has

---

[18] Even if Plaintiff were able to advance a *prima facie* case of retaliation, her claim would nevertheless fail because she has offered nothing in the way of pretext to rebut Defendants' articulated legitimate, non-discriminatory reason for the termination of her employment. *See* discussion of pretext, *supra*.

made a charge, testified, assisted, or participated in any manner in an investigation, p proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To establish the *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal relationship between the two events. *Holifield*, 115 F.3d at 1566.

Here, Plaintiff claims that she engaged in protected conduct "on a regular basis by making her supervisors aware of the discriminatory acts of her white counterparts when it came to providing the respect and courtesy to black clients of the Agency." (Doc. #56 at 25-26). *See Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) ("[W]e recognize that the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [the plaintiff], who informally voice complaints to their superiors or who use their employers' internal grievance procedures."). More specifically Plaintiff has alleged the following:[19]

- Plaintiff testified that she complained to Boleware (an African American female) on "several occasions" that Bonnie O'Dell Campos was "treating the African American male clients differently with being rude and obnoxious to them at the front desk." (Doc. #51-2, Bell Dep. at 164-65, 167-68, 178). One incident Plaintiff recalls in 2015 involved Campos "handling it, talking to him and treating him" rudely, although she did not use any racial slurs or call him any names. (*Id.* at 170-71). Plaintiff cannot recall the specific dates of these complaints nor did she put her complaints in writing. (*Id.* at 165).

- Plaintiff testified that she also complained to Boleware about Dorothy Lee Stancil, John Latham, and Megan Wheed. (*Id.* at 167, 178). As to Stancil, Plaintiff testified that Stancil was rude to African American male clients. (*Id.* at 173). Plaintiff observed the behavior, and also knew that clients complained about Stancil. (*Id.* at 174). As to Latham, Plaintiff knew clients were complaining about his behavior. (*Id.* at 175). As to Wheed, Plaintiff recalls a single time that a client complained about Wheed's behavior. (*Id.* at 175).

---

[19] These facts are stated in the manner most favorable to Plaintiff. Boleware testified that Plaintiff never made any complaints to her. (Doc. #51-18, Boleware Dep. at 137-38).

- Plaintiff does not know if Boleware investigated these complaints because "[t]hey don't release the information." (*Id.* at 177).

To establish that she engaged in opposition protected under Title VII, Plaintiff must show that she had "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). "A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Little*, 103 F.3d at 960 (italics in original).

Based on Plaintiff's testimony, no reasonable jury could conclude that Plaintiff had a good faith, reasonable belief that she engaged in statutorily protected activity. To qualify as protected activity, a plaintiff's opposition must be directed to a practice made unlawful by Title VII. *Bush v. Sears Holding Corp.*, 466 Fed. Appx. 781, 786 (11th Cir. 2012) (citing 42 U.S.C. § 2000e-3(a); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999). While Plaintiff may have believed that certain individual co-workers were treating *clients* differently on the basis of race, she never complained that JCDHR and/or ALDHR as a whole treated clients differently based upon race, nor that she personally was being treated differently on the basis of her gender or race. (Doc. #51-2, Bell Dep. at 170). And other than noting the different races of those involved, Plaintiff provides "nothing beyond conclusory speculation" that African American clients were treated worse than Caucasian clients. *Mahone v. BBG Specialty Foods, Inc.*, 2018 WL 1526336 at *12 (M.D. Ala. March 28, 2018). Plaintiff's speculation is not evidence that can overcome a properly supported motion for summary judgment. *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1318 (11th Cir. 2011) (stating that "'evidence' consisting of one speculative inference heaped upon another" was "entirely

insufficient to overcome summary judgment."). Moreover, subjective complaints of "rudeness" qualify as "those petty slights or minor annoyances that often take place at work and that all employees experience" and for which Title VII provides no protection. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Generalized complaints are not protected by Title VII. *Tlemcani v. Ga. Dep't of Comm. Health*, 2018 WL 3581133 at *18 (N.D. Ga. June 15, 2018). For these reasons, Plaintiff has failed to establish the first prong of her *prima facie* case of retaliation.

Even assuming Plaintiff's complaints could qualify as statutorily protected activity, she cannot establish a causal connection between lodging those complaints and the issuance of the charge letter. It is undisputed that Plaintiff does not specifically know when her complaints were made, only that they were made between 2009 and 2015. (Doc. #51-2, Bell Dep. at 168, 187) ("I don't remember the dates;" "I didn't put it in writing"). Plaintiff does not know the month(s) that complaints were made, nor does she know how many complaints she made during the course of her employment. (*Id.* at 165-79). Moreover, these complaints were made *only* to Boleware. (*Id.* at 167; Doc. #51-3, Heath Dep. at 167-70). Boleware was not involved in the decision to issue Plaintiff a charge letter, and there is no evidence to support a conclusion that those involved with the charge letter were even aware of the complaints. (Doc. #51-18, Boleware Dep. at 33, 44-48; Doc. #51-2, Bell Dep. at 167-76, 185). Because a plaintiff establishes a causal connection by showing that the relevant decisionmaker was "aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated," *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)), her claim for retaliation necessarily fails on the causal connection prong. *See also Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1119 (11th

Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) ("Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated.").

Plaintiff's claim for retaliation under Title VII is due to be dismissed.

## C.      Equal Protection in Violation of Fourteenth Amendment (Count IV)

Plaintiff argues that Defendants have denied her Equal Protection of the law in violation of the Fourteenth Amendment of the United States Constitution "by refusing to grant her equal employment opportunity and discriminating against her based on her race (black), and sex (female), age (over 40), color (dark skin), retaliation (prior complaints of discriminatory conduct), and national origin (Black American)." (Doc. #33, Compl., ¶¶ 48-49; Doc. #56 at 26-27). Specifically, Plaintiff argues that she was constructively discharged from her position at JCDHR and because other "white and or male counterparts were not subjected to suspension without pay and refused progressive discipline based on false and unproven allegations of misconduct as [Plaintiff]was so she has proven a prima facie case of violation of her rights under the Fourteenth Amendment to the United States Constitution making summary judgment on this issue improper as a matter of law." (Doc. #56 at 27).

Discrimination claims brought under the Equal Protection Clause are subject to the same standards of proof and employ the same analytical framework as Title VII claims. *Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009); *see also Vessels v. Atlanta Indep. Sch. Sys., Inc.*, 408 F.3d 763, 767 (11th Cir. 2005) (observing that disparate treatment claims based upon a plaintiff's race and "brought under Title VII, § 1981, and § 1983, all require discriminatory intent"); *Kidd v. City of Jasper*, 2018 WL 2766058 at *3-4 (N.D. Ala. June 8, 2018) (Putnam, J.) ("[t]he analysis of race discrimination claims in public employment under § 1983 and the Equal

Protection clause utilize the same framework as race discrimination claims under Title VII and § 1981."). Therefore, the court's analysis of the Title VII claims set forth above apply here. For those reasons, Defendants' motion for summary judgment, as it relates to Plaintiff's Equal Protection Claim, is due to be granted.[20]

## IV. Conclusion

For the reasons set forth herein, the court finds that Defendants' Motion for Summary Judgment (Doc. #49) is due to be granted in its entirety. A separate order will be entered.

**DONE** and **ORDERED** this October 19, 2018.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

[20] Even assuming, *arguendo*, that Plaintiff's Title VII claims were able to survive summary judgment, ALDHR and JCDHR are arms of the state which qualify for Eleventh Amendment immunity from Section 1983 claims. *See Scott v. Ala. Dep't of Human Resources*, 2017 WL 2462651 at *19 (N.D. Ala. June 7, 2017) (Proctor, J.) (*citing Poindexter v. Dep't of Human Resources*, 946 F. Supp. 2d 1278, 1282 (M.D. Ala. 2013) (concluding that ALDHR is a state agency); *Muhammad v. Bethel-Muhammad*, 212 WL 1854676, at *2 (S.D. Ala. May 21, 2012) (concluding that ALDHR and Dallas County Department of Human Resources are arms of the state); *Rizo v. Ala. Dep't of Human Res.*, 228 Fed.Appx. 832, 834-35 (11th Cir. 2007) (affirming the dismissal of an Americans with Disabilities Act claim against ALDHR on the ground of Eleventh Amendment immunity)). To be clear, Plaintiff's complaint fails to invoke this court's jurisdiction pursuant to 42 U.S.C. § 1983, which provides a civil cause of action to anyone deprived of federal constitutional or civil rights by another acting under color of state law, including the right to equal protection in public employment. *See Potter v. Williford*, 712 Fed.Appx. 953, 954 (11th Cir. 2017) ("The Equal Protection Clause right to be free from race discrimination in public employment is clearly established") (citing *Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir. 1995)). Likewise, § 1983 provides "the sole cause of action against state actors for violations of § 1981...." *Simpson v. State of Alabama Dep't of Human Resources*, No. 4:13-CV-01450-SGC, 2017 WL 514056, at *6 (N.D. Ala. Feb. 8, 2017) (citing *Butts v. County of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000)). Plaintiff has not invoked this court's jurisdiction pursuant to § 1983 or § 1981. (Compl., ¶¶ 1-3, 48-49). But, in any event, her Fourteenth Amendment claims would not succeed against state agencies.

For these separate and additional reasons, Defendants are entitled to summary judgment on Plaintiff's Equal Protection claim.